491 F.2d 200
 85 L.R.R.M. (BNA) 2436, 73 Lab.Cas. P 14,302
 Robert J. WILSON, Regional Director of Region 18 of the
National Labor Relations Board, for and on behalf
of the National Labor Relations Board,
Petitioner-Appellant,
v.
MILK DRIVERS AND DAIRY EMPLOYEES UNION, LOCAL 471,
affiliated with International Brotherhood of
Teamsters, Chauffeurs, Warehousemen, and
Helpers of America, Respondent-Appellee.
 No. 73-1690.
 United States Court of Appeals, Eighth Circuit.
 Submitted Dec. 13, 1973.
Decided Feb. 11, 1974.
 
 Marvin Roth, Atty., N.L.R.B., Washington, D.C., for appellant.
 Richard A. Williams, Jr., Minneapolis, Minn., for appellee.
 Before BRIGHT and STEPHENSON, Circuit Judges, and STUART, District judge.*
 STUART, District Judge.
 This is an appeal by the National Labor Relations Board (Board) from an Order of the United States District Court for the District of Minnesota entered by Judge Neville denying its petition for a preliminary injunction sought under Section 10(l) of the National Labor Relations Act as amended (the Act), 61 Stat. 149; 73 Stat. 544; 29 U.S.C. 160(l). The petition for the section 10(l) injunction was based upon a charge filed with the Board on July 24, 1973, by Ronald Roth (Roth) d/b/a Ronco Delivery (Ronco) alleging that Milk Drivers and Dairy Employees Local 471 (Union) was engaging in the unfair labor practice of secondary boycott in violation of section 8(b)(4) of the Act. After investigation, the Regional Director determined he had reasonable cause to believe the charge was true. A complaint issued and the petition for injunctive relief was filed as required by section 10(l). The District Court conducted an evidentiary hearing and on August 20, 1973, filed a Memorandum Opinion unofficially reported at 84 LRRM 2124 in which he held that the Board did not have reasonable grounds to believe a violation of section 8(b)(4)(i), (ii)(B) had occurred. An Order denying injunctive relief was filed the same day.
 The sole issue on appeal is whether the District Court erred in concluding the Board did not have reasonable cause to believe the Union was violating section 8(b)(4)(i), (ii)(B) of the Act.[1]
 Ronco, the charging party, is a milk delivery service owned by Roth. Roth's father, Mel Roth, is president and general manager of Zayre Shoppers City (Zayre), which owns several retail stores handling milk and dairy products in and around the Twin Cities. Ewald Bros. Inc. (Ewald) is a processor and distributor of dairy products at wholesale and retail levels. It is a signatory to a collective bargaining agreement between the Union and a multi-employer bargaining association in the Twin Cities area.
 Ronco, which picked up milk at Ewald's dock for delivery to one of Zayre's stores, filed the charge after the Union had, on July 23, 1973, (1) blocked Ewald's dock facilities to prevent the ingress and egress of Ronco trucks, (2) ordered employees not to load Ronco vehicles, and (3) ordered supervisors and managers not to load Ronco vehicles. Ronco charged this constituted a secondary boycott in violation of section 8(b)(4)(i), (ii)(B) of the Act. The Union claimed the action was directly aimed at preventing violations of the collective bargaining agreement and enforcing of the work preservation clause of the agreement. The trial court so found.
 In proceedings under section 10(l) of the Act the district court is not called upon to decide whether, in fact, a violation has occurred. The determination of this question is reserved exclusively for the Board with review by the Court of Appeals under section 10(e) and (f) of the Act. The inquiry of the district court is limited to a determination of whether the Board had reasonable cause to believe the Act was being violated as charged, and if it so concludes, it must grant such relief as it deems just and proper. Local Joint Board Hotel & Restaurant Employees etc. v. Sperry (8th Cir. 1963),323 F.2d 75, 77; Schauffler v. Local 1291, International Longshoremen's Association (3d Cir., 1961), 292 F.2d 182, 187-188.
 The statutory standard of 'reasonable cause' is satisfied if there is a showing of factual issues which must be resolved by the Board. Section 10(l) commands the courts to disregard their traditional reluctance to issue preliminary injunctions when there is a substantial conflict in the evidence.
 Kennedy v. Sheet Metal Workers Int. Assn. Local 108 (D.C.C.D.Cal., 1968), 289 F.Supp. 65, 91. See also, Local Joint Board v. Sperry, supra, 323 F.2d at 77-78; Douds v. Milk Drivers & Dairy Employees Union (2d Cir., 1957), 248 F.2d 534, 537.
 It is not necessary that the sole object of the Union action was that of forcing or requiring of Ewald to cease doing business with Ronco. Section 8(b) (4)(i), (ii)(B) is violated if this is one of its objects although the Union's conduct may also have other legitimate objects. NLRB v. Denver Bldg. Council (1951), 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284; Riverton Coal Co. v. United Mine Workers of America (6th Cir., 1972), 453 F.2d 1035, 1040; NLRB v. Milk Drivers & Dairy Employees Local Union No. 584 (2d Cir., 1965), 341 F.2d 29, 32; NLRB v. Local 294, International Brotherhood of Teamsters (2d Cir., 1960), 273 F.2d 696, 698; NLRB v. Wine, Liquor & Distillery Workers Union (2d Cir., 1949), 178 F.2d 584, 586, 16 A.L.R.2d 762.
 The propriety of injunctive relief does not depend upon traditional equitable principles, but whether it is necessary ot effectuate policy as announced by Congress. It is just and proper when the circumstances of a case create a reasonable apprehension that the statutory remedial purposes will be frustrated in the absence of such relief. Minnesota Mining & Mfg. Co. v. Meter (8th Cir., 1967), 385 F.2d 265, 270-272.
 Section 10(l) reflects a Congressional determination that the unfair labor practices enumberated therein are so disruptive of labor-management relations and threaten such danger of harm to the public that they should be enjoined whenever a district court has been shown reasonable cause to believe in their existence and finds that the threatened harm or disruption can best be avoided through an injunction. Retail Clerk's Union v. Food Employers Council, Inc. (9th Cir., 1965), 351 F.2d 525, 531.
 We have held that the scope of review when a preliminary injunction is granted is limited to determining whether the district court's finding that there was reasonable cause to believe that unfair labor practices had occurred is clearly erroneous and whether the court abused its discretion in granting injunctive relief. Minnesota Mining & Mfg. Co, v. Meter, supra, 385 F.2d at 269; Local Joint Board v. Sperry, supra, 323 F.2d at 77. However, we have not considered the scope of review in instances where the district court found the Board had no reasonable cause to believe the Act was being violated. The Second Circuit has considered this question and stated:
 While the responsibility of the district court is well defined, our own role on appeal is less clear. Were this an appeal from the grant after an evidentiary hearing of a 10(l) injunction our scope of inquiry could be limited by the 'clearly erroneous' test. However, when the appeal is from the denial of a petition for a 10(l) injunction, it seems that, in light of congressional policy favoring the grant of such injunctions in appropriate circumstances, our scope of review ought not to be so limited.
 National Maritime Union of America v. Commerce Tankers Corp. (2d Cir., 1972), 457 F.2d 1127, 1133-1134. See also, Boire v. International Brotherhood of Teamsters (5th Cir., 1973), 498 F.2d 778, 793 n. 15; Local No. 83, Construction etc. Drivers Union v. Jenkins (9th Cir., 1962), 308 F.2d 516, 517 n. 1; Brown v. Pacific Telephone & Telegraph Co. (9th Cir., 1954), 218 F.2d 542, 544 and Pope, J., concurring, 544.
 
 
 1
 We believe this line of cases takes the correct approach to appellate review of a denial of section 10(l) injunction. We therefore examine the evidence to determine whether the trial court erred in refusing to grant injunctive relief.
 
 Summary of the Evidence
 
 2
 In late winter or early spring of 1971 Robert Hosp, president and general manager of Ewald sold one share each of his own stock in Ewald to Roth and two other gentlemen in the retail dairy business in an attempt to increase Ewald's business. All three were elected to the Ewald Board of Directors increasing its number to six.
 
 
 3
 Ewald and Roth also entered into a personal service contract under which Roth was to receive $500 per month to obtain new business for Ewald. Ewald also agreed to lease Roth a fully depreciated truck for $100 per month. After one payment the truck was sold to Roth for that payment and a small tractor. Roth had spent $600 in repairs. They agreed this amount was more than the truck was worth. An Ewald employee testified Hosp told him he intended to set Roth up in the milk delivery business.
 
 
 4
 At about the same time Ewald, for the first time, began selling dairy products at wholesale to Zayre's stores on a day-to-day basis. Zayre was billed at Ewald's dock price plus 8 percent for delivery expense.
 
 
 5
 In February, 1971, Roth sought a collective bargaining agreement with the Union. Robert Moran, the Union secretary-treasurer denied Roth and his sole employee membership and refused to negotiate a contract because Ronco was not yet in business. Ronco was formed in March, 1971, and began delivering milk from non-union Shroeder Dairy to Zayre. In April, 1971, Roth met Moran in front of a Zayre's store passing out handbills which read 'Shroeder Milk is non-union milk.' Roth again requested negotiations with Moran for a collective bargaining agreement with Ronco. Moran refused 'because he could not allow Shoppers City (Zayre) to have a contract.' Roth told him he was no longer with Zayre but was in business for himself.
 
 
 6
 In the fall of 1972, Zayre opened the South Roberts Store in Minneapolis. Zayre had discussed Ewald's supplying the store and Hosp assumed the same sale and delivery arrangement would prevail. However, Zayre informed Hosp that Ronco would deliver Ewald products to that store. Ewald continued to deliver to all other stores. On products sold for the South Roberts Store, Ewald billed Zayre for the delivered price and paid the 8 percent delivery charge to Ronco. The Union was aware that Ronco was delivering to this one Zayre store but made no protest.
 
 
 7
 The store had not opened when Roth told Moran about it so none of the Union members would be losing a job. Moran testified:
 
 
 8
 We were very fearful that being the son of the owner of (Zayre) that he would go into the other stores and we didn't want our members serving those stores to lose their jobs.
 
 
 9
 Roth and the Union began contract negotiations. Moran asked Hosp during these negotiations if Ewald would grant its employees special leave of absence to work for Ronco with the understanding that they could return to Ewald if Ronco failed. Hosp agreed if Ewald continued to supply Zayre's stores.
 
 
 10
 The Union refused to let Ronco contract under the association collective bargaining agreement but insisted on three additional conditions:
 
 
 11
 (1) Ronco would give first hiring opportunities to Ewald employees.
 
 
 12
 (2) Ronco would handle only union produced dairy products.
 
 
 13
 (3) Ronco would arrange for Zayre to cease buying non-union milk.
 
 
 14
 On December 28, 1972, Roth accepted the first two conditions. In a letter written the next day by his attorney, the Union was informed he could not agree to the third condition because
 
 
 15
 (a) he has no control over the operation of Zayre's and (b) by comparative price the non-union dairy products sell in the store for less than the union produced products, and we are advised that the consumers request the availability of these products.
 
 
 16
 On January, 9, 1973, the Union refused Roth's partial acceptance.
 
 
 17
 In mid-January, 1973, Moran and business agent Peters instructed Hosp that Ewald should cease loading Ronco trucks. Hosp protested that Ewald would lose a large portion of its business and said the matter should be resolved between Ronco and the Union. Ewald continued to load the Ronco trucks.
 
 
 18
 Moran testified negotiations with Roth were closed January 9, 1973, and that at Hosp's request the Union agreed to give him more time to see if he could negotiate with the Roths. Hosp testified he asked Moran in early spring how the Union was proceeding with the Ronco contract and was told Moran was too busy now but that Hosp should not worry about it.
 
 
 19
 On or about July 13, Moran called Hosp and told him he had heard a rumor Ronco was to start hauling all Ewald products sold to Zayre's. Hosp said he had heard the rumor but nothing had changed. Moran commented, 'I guess we will have to stop the son of a bitch.'
 
 
 20
 On July 16, Ewald received a letter from Moran as secretary-treasurer of the Union stating:
 
 
 21
 This letter is to notify you that Local 471 intends to enforce Article V.Z.A. of the contract concerning the delivery of milk by union personnel.
 
 
 22
 Therefore, as of the end of this week, July 21, 1973, the products being delivered by non-union personnel to (Zayre's) stores shall be discontinued.
 
 
 23
 Please comply.
 
 
 24
 So far as the record shows this is the first time contract violations were mentioned to Ewald. Hosp so testified.
 
 
 25
 Hosp notified Roth of the Union letter and discussed the serious effect on Ewald's business with Moran, who replied they were not going to load Ronco.
 
 
 26
 On July 18, Mel Roth, owner of Zayre and father of Roth, informed Hosp by letter that Zayre had contracted for Ronco to become its 'exclusive distributor of milk and milk products.' The written agreement was executed July 20, 1973. Under the agreement Zayre purchased all dairy products from Ronco and Ronco purchased from any source it chose. Father and son had contemplated this relationship since Roth started Ronco.
 
 
 27
 On July 23, 1973, the Union business agent acting in accordance with the Moran letter of July 16 instructed Ewald's employees, supervisors and managers not to load Ronco trucks. Ewald's dock was blocked by a business agent's automobile. On that same date Hosp wrote Ronco and Zayre that Ewald could no longer deliver dairy products to Ronco. Since July 23, no Ewald products have been picked up by Ronco for resale to Zayre.
 
 
 28
 Zayre's purchases had previously constituted 40 percent of Ewald's wholesale sales and 20 percent of Ewald's total sales of $125,000 per month. Sales volume dropped about $1,000 per day. Ewald has continued to deliver special orders to Zayre's but very little fluid milk is delivered.
 
 
 29
 At the hearing on August 9, 1973, there was testimony that other non-union dairies had picked up milk at the Ewald dock without Union objection before and after July 23, 1973. The Union denied knowing these dairies were non-union. After the hearing, notices were posted that Gustafson Dairy and Morning Fresh Dairy trucks were not to be loaded. The Board then moved the district court for leave to amend the Board's petition for injunctive relief to include enjoining the Union from pressuring Ewald to force it to cease doing business with these two dairies. The motion was granted. The trial court did not rule one way or the other on this new alleged violation because no evidence was presented.
 
 
 30
 While one view of the evidence adduced at the hearing might have supported the district court's decision that Ewald was not a neutral vis-a-vis Ronco and that the primary dispute was between Ewald and the Union to enforce the work preservation provision of the collective bargaining agreement, the evidence viewed as a whole would also furnish ample support for the Board's allegations that it had reasonable cause to believe that one of the objects of the Union action against Ewald was to force Ewald to cease doing business with Ronco and constituted a secondary boycott.[2] The assertion of a contractual right is not a defense to conduct which is proscribed by section 8(b)(4)(B). Local 1976, United Brotherhood of Carpenters v. NLRB (1958), 357 U.S. 93, 104-106, 78 S.Ct. 1011, 2 L.Ed.2d 1186.
 
 
 31
 In our opinion this record presents such conflicting evidence from which different inferences and conclusions may be drawn that the resolution of these disputed factual issues either by this court or the district court would constitute an invasion of the fact-finding function reserved by Congress to the Board. We therefore hold that the district court erred in finding the Board had no reasonable cause to believe the Act had been violated in the charge brought by Ronco.
 
 Gustafson and Morning Fresh
 
 32
 The evidence here is in conflict as to whether the Union knew these were non-union dairies prior to the hearing on August 9. In any event notice not to load Gustafson and Morning Fresh trucks was posted on August 10. There was no claim Ewald employees had ever delivered to these two dairies. Mr. Moran testified the letter to Ewald was a request that it cease distributing any milk through non-union personnel. There was reasonable cause for the Board to believe the Union's primary object was not to preserve work properly claimable for Ewald employees but to increase the field of dairy transportation for Local 471 members generally. If this was the purpose, the Union's action at the Ewald dock on August 10 in stopping deliveries to Gustafson and Morning Fresh would have been a violation of section 8(b)(4)(i), (ii)(A) and (B). NLRB v. Milk Drivers' Union, Local No. 753 (7th Cir., 1968), 392 F.2d 845, 847.
 
 Injunctive Remedy
 
 33
 The evidence here discloses that Ewald suffered a substantial loss of sales to Zayre through Ronco as a result of the Union action. This appears to be the typical situation in which injunctive relief would be just and proper after a finding there was reasonable cause to believe the Act had been violated.
 
 
 34
 We hold that the issuance of an injunction would be just and proper here and therefore we remand for its issuance after a determination by the district court of the extent of the relief required to preserve the status quo until an adjudication by the National Labor Relations Board.
 
 
 35
 Reversed and remanded.
 
 
 
 *
 W. C. STUART, District Judge, Southern District of Iowa, sitting by designation
 
 
 [1]
 Section 8(b)(4)(i), (ii)(B) of the Act makes it an unfair labor practice for a labor organization or its agents:
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or (ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is: (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *. Provided That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.
 
 
 [2]
 Prior to submission of this case on appeal, an administrative law judge rendered a decision holding that the Union had engaged in unfair labor practices within the meaning of section 8(b)(4)(i), (ii)(A) and (B) of the Act