Joseph H. **SOLIEN, Regional Director of Region 14 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Appellant,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC, Appellee.**

No. 78–1411.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1978.

Decided Feb. 22, 1979.

Joseph E. Mayer, Asst. Gen. Counsel, N.L.R.B., Washington, D.C., for appellant; John S. Irving, Gen. Counsel, John E. Higgins, Deputy Gen. Counsel, Harold J. Datz, Associate Gen. Counsel, and Thomas M. Gosselin, Atty., Washington, D.C., on briefs.

Carl B. Frankel, Associate Gen. Counsel, U.S. Steelworkers of America, Pittsburgh, Pa., for appellee; Rudolph L. Milasich, Jr., Pittsburgh, Pa., Bartley, Goffstein, Bollato & Lange, St. Louis, Mo., Michael H. Gottesman, Bredhoff, Gottesman, Cohen & Weinberg, Washington, D.C., and Bernard Kleiman, Chicago, Ill., on brief.

McMahon, Berger, Breckenridge, Hanna, Linihan & Cody, St. Louis, Mo., for Pet, Inc., and Hussmann Refrigerator Co.

Before GIBSON, Chief Judge, and BRIGHT and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

This is an appeal by the Regional Director (Director) of the Fourteenth Region of the National Labor Relations Board from an order of the United States District Court for the Eastern District of Missouri (The Honorable John F. Nangle, District Judge) dismissing a petition for an injunction that had been filed by the Director on behalf of the Board pursuant to the provisions of § 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(*l*). The defendant in the case, appellee here, was the United Steelworkers of America, a national labor organization and hereinafter called the Union or the Steelworkers.

We reverse and remand.

Hussmann Refrigerator Company (Hussmann), a Delaware corporation authorized to do business in Missouri, is a wholly owned subsidiary of Pet, Incorporated (Pet), and Hussmann maintains and operates a number of facilities for the manufacture, distribution and sale of refrigeration equipment and other items of merchandise such as shelving for retail stores and checkout counters for operations such as grocery stores and supermarkets. For a number of years prior to May, 1977 Hussmann employees had been represented for collective bargaining purposes by Local 13889 of the Steelworkers. A collective bargaining agreement between Hussmann and the Steelworkers that had gone into effect in 1974 expired on May 1, 1977. The parties had not been able to agree on a new contract, and when the old one expired the Union struck the Hussmann plant located at Bridgeton, St. Louis County, Missouri.

After the strike had gone on for some time, Hussmann permanently replaced the strikers with other employees, an action that naturally was not pleasing to the Union. On October 21, 1977 Lloyd McBride, the International President of the Steelworkers, held a televised news conference in St. Louis and announced that the Union was calling for a nationwide consumer boycott of Pet, its operating divisions, and products sold by Pet.

This call for a consumer boycott was implemented by some newspaper advertisements inserted in papers having a general circulation in the Greater St. Louis area and by the circulation of handbills by Union members and sympathizers urging consumers not to patronize certain identified businesses owned by Pet and not to purchase certain identified Pet products.

The immediate controversy between Hussmann and the Union was accompanied by Union picketing of the Bridgeton plant of Hussmann and of certain other Hussmann facilities. However, the distribution of handbills in connection with the Union's consumer boycott effort did not involve the picketing of any business or establishment; nor did it involve any threatening or disorderly conduct. The handbills appear to have been written and distributed in strict accordance with ground rules prepared by

the Union and its counsel with the end in view of avoiding a successful charge by Pet and its subsidiaries of a "secondary boycott" made unlawful by § 8(b)(4)(ii)(B) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b)(4)(ii)(B).

The instant case had its genesis in the fact that in November, 1977 Pet filed with the National Labor Relations Board an unfair labor practice complaint against the Union charging an unlawful secondary boycott. The charge was amended twice with the second amendment being filed on March 1, 1978. The Board, after some preliminary investigation, assumed jurisdiction of the case, and on March 10, 1978 commenced this action praying for the issuance of an injunction against the Union until the unfair labor practice charge filed by Pet should be decided by the Board. The petition alleged that there was reasonable cause to believe that the unfair labor practice alleged in the second amendment to the charge had in fact been committed.

The Union resisted the petition in the district court on three grounds: (1) that the conduct of the Union of which Pet complained did not constitute an unlawful secondary boycott; (2) that the conduct in question was protected by the publicity proviso appearing in § 8(b)(4) of the Act; and (3) that a holding that the conduct in question constituted a violation of the Act would involve a violation of the right of free speech guaranteed by the first amendment to the Constitution of the United States.

Prior to and in the course of the submission of the case to the district court the facts and issues were developed about as fully as they would have been had this injunction suit never been filed and had the parties been contemplating an evidentiary hearing before an administrative law judge, with his decision being subject to review by the Board, and with the Board's determination being subject to appropriate consideration by this court in a direct action commenced herein. Most of the significant facts were set out in stipulations that were filed in the district court.

The case was submitted to the district court on the complete record plus briefs and oral argument. In May, 1978 the district court filed its memorandum opinion setting out its findings of fact and conclusions of law and entered its order dismissing the Director's petition. Notice of appeal was timely filed.

Before going further we deem it well to refer to the pertinent provisions of the Act.

Section 8(b) defines unfair labor practices of which labor organizations or their agents may be guilty and prohibits those practices. The "secondary boycott" prohibition, invoked by Pet, appears as § 8(b)(4)(ii)(B). That subsection makes it unlawful for a labor organization to threaten, coerce or restrain any person "engaged in [interstate] commerce or in an industry affecting commerce" where, in either case, the object of the conduct is:

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing  .   .   .   .

That prohibition, however, is subject to certain provisos, including the following:

That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publici-

ty does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution . . . .

Insofar as here relevant, § 10(*l*) of the Act is as follows:

(*l*) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law . . . .

Significant facts in the case are not in serious dispute and may be summarized as follows.

Pet is a Delaware corporation that has its principal executive offices in the City of St. Louis. It is a huge, nationwide business conglomerate that manufactures, distrib-

utes and sells a wide variety of products falling into a number of distinct categories. Pet's operating arms are organized into a number of "groups" with each group containing several "divisions." As far as day to day operations are concerned, the individual divisions have a good deal of autonomy, although it is clear that ultimate control is vested in Pet and that Pet lays down general policies applicable to all divisions. Profits earned by a particular division inure to Pet's benefit, and losses sustained by a particular division must ultimately be borne by Pet.[1]

As stated, Hussmann is a wholly owned subsidiary of Pet and is a division of the so-called "Hussmann Group." Hussmann was established in the mid-1960's with moneys advanced by Pet amounting to fifty million dollars. The advance was not evidenced by any note or secured by any mortgage; the obligation bore no interest and there was no fixed schedule of repayment. As of the end of March, 1978 Hussmann was indebted to Pet in the sum of approximately sixteen million dollars.

There is no question that Hussmann is engaged in interstate commerce or that it is an industry the activities of which affect interstate commerce. Its volume of business is large and it employs numerous people. It is, in other words, an employer which is subject to the jurisdiction of the Board. Through the years Hussmann has had direct or indirect dealings with other Pet divisions.

While the consumer boycott called for by the Union was described as "nationwide," it appears to us that attempted implementation of the call was limited to the City of St. Louis, to St. Louis County, and to areas in western Illinois where many persons who work in and around St. Louis reside.

The newspaper advertisements employed by the Union and the handbills that were distributed contained brief and generally

---

**1.** No useful purpose would be served by listing all of the enterprises operated by Pet or all of the products sold by Pet. We will mention the fact that Pet owns and controls the familiar chain of roadside restaurants known as "Stuck-ey's," and that it also owns the chain of retail liquor stores known as "9–0–5." Included among products sold by Pet are "Pet Milk" and "Whitman's Chocolates."

accurate descriptions of the controversy between the Union and Hussmann. Consumers were urged not to patronize "Stuckey's" or the "9–0–5" stores, and not to buy a number of specifically identified Pet products.

In his opinion the trial judge found the facts substantially as we have set them out, and then proceeded to state his conclusions of law.

At the outset of its discussion the district court recognized that its function in a § 10(*l*) proceeding was not to determine whether an unfair labor practice had in fact been committed, but simply to determine whether there was reasonable cause to believe that a violation of the Act had occurred, and, if so, whether an injunction should issue for the purpose of preventing a frustration of Congressional policy in the field of labor relations, and the court cited our holding in *Wilson v. Milk Drivers & Dairy Employees Union, Local 471*, 491 F.2d 200, 203 (8th Cir. 1974).

Proceeding, the trial judge after quoting relevant statutory provisions went on to say:

> The facts adduced herein establish that respondent Union engaged in handbilling and advertising only. There was no picketing involved, nor was any of the handbilling accomplished at or near a facility owned by Pet, Inc. or selling Pet products. Due to the relationship between Pet and its subsidiaries, it is obvious that the Union sought a consumer boycott in order to exert the maximum economic pressure possible upon Hussmann to end its dispute with the Union. There is no evidence in this record of any threat or coercion directed at any individual engaged in commerce or in an industry affecting commerce. Certainly, a consumer does not fall within such a definition. If Pet and its subsidiaries are viewed as the individuals engaged in commerce at whom the threats or coercion are supposedly directed, the record is devoid of any evidence that the Union forced or required any person to cease using or otherwise dealing in Pet products. The loca-

tions of the handbill distributions, away from any facility owned by Pet, Inc. or selling Pet products, totally negates any inference that the Union sought to force, coerce or restrain individuals. There is absolutely no evidence from which to conclude or even infer that respondent had as its object the forcing of any employer to cease doing business with Hussmann.

> Accordingly, the Court must conclude that upon the record presented herein, the Union's actions do not fall within the prohibitions of the Act. *Cf., National Labor Relations Board v. Servette, Inc.,* 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964). Under such circumstances, the Court is unable to conclude that the Board has reasonable cause to believe that the Act was violated. The petition for the issuance of an injunction will therefore be denied.

Were this an ordinary civil case in which the plaintiff sought either a preliminary or a permanent injunction, we might have little difficulty in holding that the trial court did not err or abuse its discretion in denying injunctive relief.

However, as the district court itself recognized, this is not an ordinary civil case, and the discretion of a district court in determining whether an injunction should issue in a § 10(*l*) case is a limited one. The governing standard in this circuit was laid down in the recent case of *Hendrix v. Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO, Dist. Local 340*, 555 F.2d 175 (8th Cir. 1977), and cases cited. In the *Hendrix* case the controversy was as to whether certain union picketing was "organizational" or whether it was merely "informational." We said, 555 F.2d at 178:

> Upon this basic set of facts the NLRB claims that the picketing was organizational in character and the union claims it was only informational. For the purposes of this appeal we do not need to decide which interpretation is correct and we specifically do *not* express an opinion thereon. Our only duty in assessing a request for injunctive relief is set forth in

*Wilson v. Milk Drivers & Dairy Employees Local 471*, 491 F.2d 200, 203 (8th Cir. 1974).

In proceedings under section 10(*l*) of the Act the district court is not called upon to decide whether, in fact, a violation has occurred. The determination of this question is reserved exclusively for the Board with review by the Court of Appeals under section 10(e) and (f) of the Act. The inquiry of the district court is limited to a determination of whether the Board had reasonable cause to believe the Act was being violated as charged, and if it so concludes, it must grant such relief as it deems just and proper. *Local Joint Board Hotel & Restaurant Employees etc. v. Sperry* (8th Cir. 1963), 323 F.2d 75, 77; *Schauffler v. Local 1291, International Longshoremen's Association* (3d Cir., 1961), 292 F.2d 182, 187–188.

The statutory standard of "reasonable cause" is satisfied if there is a showing of factual issues which must be resolved by the Board. Section 10(*l*) commands the courts to disregard their traditional reluctance to issue preliminary injunctions when there is a substantial conflict in the evidence. *Kennedy v. Sheet Metal Workers Int. Assn. Local 108* (D.C.C.D.Cal., 1968), 289 F.Supp. 65, 91. *See also, Local Joint Board v. Sperry, supra*, 323 F.2d at 77–78; *Douds v. Milk Drivers & Dairy Employees Union* (2d Cir., 1957), 248 F.2d 534, 537.

In this case, as in *Dawidoff v. Minneapolis Building & Construction Trades Council*, 550 F.2d 407 (8th Cir. 1977), we cannot say, based on this record, that there is no reasonable basis upon which the NLRB would be able to sustain its charge before the Board. For that reason the injunction must issue to permit the Board a reasonable time to make the initial determination which Congress has entrusted it to make.

The instant case may be a somewhat unusual labor case in that while many facts are undisputed the conduct of the Union cannot readily be characterized as being or as not being a "secondary boycott" generally prohibited by § 8(b)(4)(ii)(B) but perhaps protected by the "publicity" proviso of the Act or by the first amendment to the Constitution.

We are concerned with contentions that the Union's appeals for a consumer boycott of Pet's divisions and their products in support of the Union's dispute at the Bridgeton plant unlawfully restrained and coerced Pet and its divisions. We are concerned with the question whether the boycott was pursued unlawfully for the object of causing Pet's divisions to cease doing business with their customers, suppliers and distributors and to cause their customers, suppliers and distributors to cease doing business with Pet and its divisions. In these areas especially, we are impelled to the conclusion that in holding that the conduct in question did not violate the Act and in denying the injunction on the basis of that holding the trial judge exceeded permissible limits of district court inquiry under § 10(*l*).

Upon the record now before us, we are convinced that there was reasonable cause to believe that a violation of the Act had occurred. Accordingly, the judgment of the district court must be reversed and the cause remanded with directions.

The fact that we hold that the judgment of the trial court is to be reversed and the cause remanded does not mean that the Director is entitled to an injunction of indefinite duration while the Board ponders the issue or issues raised by Pet's unfair labor practice charge as amended. Again, *Hendrix, supra*, is instructive. We said, 555 F.2d at 178:

At the hearing before this court the attorney for the NLRB indicated that, assuming cooperation of both parties, a final decision of the Board could reasonably be possible by August 1, 1977. Accordingly, we direct the district court to grant an injunction, as requested by the NLRB, which will expire on August 1, 1977, unless by that date the Board has issued its decision upholding the position now taken by the NLRB. *See Dawidoff*

*v. Minneapolis Building & Construction Trades Council,* supra, 550 F.2d at 412–414. If such a decision is issued, the union may request this court to review the decision at the September term of this court.

In the course of the remand the district court should determine whether and to what extent the Union conduct complained of is being continued or is likely to be resumed and the status of the proceeding before the Board.[2] If it appears to the district court that the conduct in question is still going on or is likely to be resumed and if the Board's ruling on the issues before it is not to be expected immediately, an injunction should issue as prayed for by the Director.[3] We leave the question of the duration of the injunction in the first instance to the discretion of the district court. In any event, if it appears that agency action is being unreasonably delayed, the Union may apply under Fed.R.Civ.P. 60(b) for a modification of the terms of or dissolution of the injunction.

Reversed and remanded for further proceedings consistent with this opinion.

---

2. In the Union's brief it is stated that after Judge Nangle denied the Director's application for an injunction, the parties waived a hearing before an administrative law judge and submitted the case to the Board on an agreed record. We think it probable that that record was about the same record made before the district court in this case, although we do not know.

3. The claims of the Union based on the first amendment to the Constitution and on the "publicity proviso" appearing in § 8(b)(4) of the Act are not insubstantial, and the question of their validity must at some stage of this controversy be decided. The district court did not pass upon that question, nor do we pass upon it at this essentially preliminary stage of the unfair labor practice proceeding. The Board should consider the claims in question, and its determinations with respect to them will be subject to review here if any direct proceeding is commenced in this court as provided by § 10(e) or § 10(f) of the Act.