**Ronald M. SHARP, Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**MILLER WASTE MILLS, INC. d/b/a RTP Company, Respondent.**

**No. Civ. 98–1669(JRT/RLE).**

United States District Court,
D. Minnesota.

Sept. 24, 1998.

A. Marie Simpson, N.L.R.B., Minneapolis, MN, for Petitioner.

Paul James Zech, Felhaber Larson Fenlon & Vogt, Minneapolis, MN, for Respondent.

## MEMORANDUM OPINION AND ORDER ON PETITIONER'S MOTION FOR A TEMPORARY INJUNCTION

TUNHEIM, District Judge.

This matter is before the Court on petitioner Ronald Sharp's motion for a tempo-

rary injunction pursuant to section 10(j) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(j). Sharp, on behalf of the National Labor Relations Board ("NLRB"), seeks to enjoin respondent Miller Waste Mills, Inc. ("Miller"), from engaging in a number of practices it contends violate section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), during the pendency of a proceeding before the NLRB involving Miller and the United Auto Workers ("UAW"). For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

Miller operates a plant in Winona, Minnesota. In February 1998, the plant employed approximately 198 production and maintenance workers.

On February 10, 1996, these production and maintenance workers ("bargaining unit workers"), then members of the Winona Free Union, voted to affiliate with the UAW. According to Miller, based on the process employed by union officials, affiliation with the UAW was only approved by thirty-six percent of bargaining unit workers.[1] Following the election, the local chapter of the UAW ("the Local Union") claimed that it had become the collective bargaining representative for Miller's production bargaining unit workers. After Miller refused to recognize and bargain with the Local Union, the UAW filed a charge with the NLRB. On February 20, 1997, the NLRB found—in affirming the Administrative Law Judge's decision—that Miller had violated section 8(a)(5) by refusing to recognize and bargain with the Local Union.

Miller and the Local Union met on nine occasions from April 1997 to early 1998. The parties dispute whether Miller bargained in good faith during this period. The NLRB contends that Miller never made good faith attempts to resolve the differences between it and the Local Union, and points to the history of acrimony between these parties as evidence of its bad faith. In defending its actions, Miller notes that, although the parties did not reach agreement on all terms, it immediately accepted twelve of the Local Union's proposals and attended all bargaining sessions. Despite the efforts of a federal mediator during the later meetings, the parties failed to reach agreement on a collective bargaining agreement ("CBA") to succeed the contract between Miller and the Winona Free Union.

During August 1997, Miller proposed a wage freeze for 1997 and 1998. As 1997 drew to a close, the Local Union stated that they would not oppose the traditional wage increase for employees and would allow a decrease in insurance premiums, despite the fact that the parties had not reached a broader agreement. According to testimony in the pending matter before the Administrative Law Judge ("the ALJ"), the Local Union agreed that they would not file an unfair labor practice charge with the NLRB if Miller granted union members such improvements. At that time, Miller would not commit to such a raise.

On December 11, 1997, the Local Union agreed to consider an election among bargaining unit workers to determine whether the union had majority support. However, the Local Union's representative notified Miller on December 23 that the union had decided they could not agree to hold such a vote.

Miller's president and CEO sent a letter to all unit workers on January 2, 1998, indicating that they would not be granted an annual raise "for the first time in [the company's] long history." The letter began by referencing the negotiations between Miller and the Local Union and noting that no agreement had been reached. The letter also stated that the UAW would allow Miller "to give employees an increase in pay and to decrease insurance costs but no specifics were discussed." In the next sentence, the letter stated: "You will recall when [Miller] raised wages last year, the UAW filed an unfair labor practice charge against us." The letter further proclaimed that Miller could not deal with wages or benefits "piecemeal." It then went on to state that although wage increases and decreased insurance costs are needed, Miller could not trust the UAW after it "pulled the rug out from under us by denying

---

**1.** In fact, Miller claims that the UAW has never enjoyed majority support among unit workers.

an election." In conclusion, the letter stated that this was the first such denial of a wage increase in the company's history and that Miller is "continually exploring ways to ensure that neither our employees nor [the company] are damaged any further by this fiasco."

In response to this letter, Local Union officials demanded that Miller give unit workers the traditional pay raise. In a letter dated January 12, the union reminded Miller that it had indicated in negotiations that it would not file an unfair labor charge if the employees were given a raise. The letter goes on to request that the company provide such a raise effective January 1, 1998. Finally, the letter warns that Miller should give unit workers a pay raise or else the Local Union would file an unfair labor charge.

On January 15, bargaining unit workers sent Miller a signed petition asking for "a fair and decent wage increase and better insurance for 1998." The petition contained a cover sheet which stated that it is "in no way, shape or form connected with any orgainization [sic] or business."

The next day, Miller issued a letter addressed to its "loyal employees," without notifying the union. The letter announced an increase of $.51 per hour effective January 12, 1998. The letter stated that "[r]egardless of the UAW and the NLRB and all of those problems, we are going to do what you asked." The letter further declared that it would "get back" to the employees regarding the cost of health insurance.

On February 13, 1998, Miller announced through another letter that it was reducing employee health insurance payments. Again, Miller had not consulted with the Local Union before making the announcement.

Later that month, a bargaining unit worker informed Miller's vice president that 125 such employees had signed a petition indicating that they no longer wanted the UAW to represent them. The employees delivered the signed petition to a Winona attorney who had represented the Winona Free Union. The attorney then sent the vice president a letter with an unsigned sample of the petition, informing him that the signed petition contained signatures of the clear majority of the bargaining unit employees.

On February 26, 1998, Miller informed the Local Union that, based on the letter it had received from the attorney, it would no longer recognize or bargain with it. The Local Union's representative objected that Miller had not given him a signed petition.

After Miller withdrew its recognition of the Local Union, it began processing unit employee grievances without the union's participation. It also refused to allow employees to take unpaid time during work hours to conduct union business. Moreover, in April and May 1998, Miller implemented an attendance reward policy and changed health insurers without informing or bargaining with the Union.

Thereafter, the UAW filed a charge with the NLRB alleging Miller violated sections 8(a)(1) and (5) of the Act by engaging in a variety of actions which constitute a failure to bargain collectively and in good faith with the Local Union (so-called "surface bargaining"). The UAW further contends that Miller unlawfully withdrew recognition of the union. The administrative action came before the ALJ at a hearing in June and early July 1998.

The NLRB now petitions this Court for a temporary injunction under section 10(j) to prevent Miller from taking various allegedly harmful steps during the pendency of the administrative proceedings. Specifically, the NLRB seeks an order providing the following temporary relief: (1) requiring Miller to provide the Local Union requested, relevant information; (2) ordering Miller to cease dealing directly with unit employees in processing grievances; (3) requiring Miller to rescind its decision to eliminate employees' right to request and receive unpaid time off in order to conduct Union business during scheduled work time; (4) precluding Miller from implementing any further changes in working conditions until it has remedied the alleged unlawful conduct; (5) ordering Miller to recognize and bargain in good faith with the Local Union; and (6) requiring Miller to post an appropriate notice to employees.

## DISCUSSION

### I. Standard

The threshold question in this case is the standard a court must apply in determining whether to issue an injunction under section 10(j). Section 10(j) provides as follows:

The [NLRB] shall have power, upon issuance of a complaint as provided in subsection (b) [of this section] charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

The NLRB argues that it must demonstrate only that 1) there is "reasonable cause to believe that an unfair labor practice has occurred," and 2) if reasonable cause exists, equitable relief would be "just and proper." It contends that the "reasonable cause" prong is satisfied by the mere showing that there is some reasonable basis for the unfair labor practices allegations at issue. It suggests that the "just and proper" prong is satisfied where some kind of irreparable harm may result absent the issuance of an injunction or where an injunction would be to the benefit of the public. In advocating this standard, the NLRB relies principally on older Eighth Circuit cases, one involving a section 10(j) injunction, and two addressing injunctive relief under section 10(*l*) of the Act. *See Solien v. United Steelworkers of America,* 593 F.2d 82, 87 (8th Cir.) (section 10(*l*)), *cert. denied,* 444 U.S. 828, 100 S.Ct. 54, 62 L.Ed.2d 36 (1979); *Hendrix v. Inter-*

*national Union of Operating Engineers, Local 571,* 592 F.2d 437, 441–43 (8th Cir.1979) (section 10(*l*)); *·Minnesota Mining & Mfg. Co. v. Meter,* 385 F.2d 265, 269 (8th Cir.1967) (section 10(j)).

Miller responds by citing a 1996 case from this District, in which the court concludes that the equitable factors set forth in *Dataphase Systems, Inc. v. CL Systems, Inc.,* 640 F.2d 109, 114 (8th Cir.1981), should be balanced to determine whether a section 10(j) injunction should issue. *See Sharp v. Koronis Parts, Inc.,* 927 F.Supp. 1208, 1210 (D.Minn.1996). The court reached this conclusion by analyzing the reasoning in *Meter, supra,* and implicitly disregarding the more permissive standard suggested in the section 10(*l*) cases. *See id.* Under *Dataphase,* the Court considers (1) the threat of irreparable harm; (2) the balance between the harm to the movant and the injury to the other party if the injunction issues; (3) the probability that petitioner will succeed on the merits; and (4) the public interest. 640 F.2d at 114.

Based on its own review of *Meter,* the Court believes that the standard set forth therein is somewhat akin to that utilized in *Dataphase.*[2] In particular, the Court is convinced that *Meter* requires a strong showing of irreparable harm, namely, that alleged practices, unless enjoined, would have a serious adverse effect on the aggrieved party which could not be ,remedied through the ongoing proceedings before the NLRB. *See* 385 F.2d at 270. In other words, *Meter*'s analysis indicates that the Court can issue an injunction only if the NLRB demonstrates that Miller's actions would destroy (as a practical matter) the union's ability to vindicate effectively its rights in the NLRB proceedings. *See id.* The Court therefore disagrees with the NLRB to the extent it suggests that the "just and proper" prong lacks vigor.

---

**2.** The Court agrees with the suggestion in *Sharp,* 927 F.Supp. at 1210, that the section 10(*l*) cases are not persuasive in the section 10(j) context. In particular, the *Meter* court's emphasis on the narrow circumstances in which relief is appropriate under section 10(j), *see* 385 F.2d at 270, is in clear contrast to the more permissive approach to section 10(*l*) suggested in *Solien,* 593

F.2d at 87, and *Hendrix,* 592 F.2d at 443. Likewise, unlike in *Meter,* the Eighth Circuit in *Solien* expressly rejected application of the traditional equitable factors in determining whether to issue a section 10(*l*) injunction. *See* 593 F.2d at 87 ("The propriety of injunctive relief does not depend upon traditional equitable principles....").

Moreover, the Court finds no support in *Meter* for the proposition that "reasonable cause" is as permissive as the NLRB contends.[3] However, the *Meter* court's emphasis on deference to the NLRB proceedings and caution to avoid muddling the distinction between the administrative ·and judicial processes, *see* 385 F.2d at 270, suggests that deep forays into the merits should be avoided. Thus, although section 10(j)'s reasonable cause prong is similar to the "likelihood of success on the merits" prong of *Dataphase*, the Court believes it should not undertake a detailed analysis of the merits of the NLRB's allegations. Rather, a showing by the NLRB that it has. a strong claim against Miller in the administrative proceeding probably is sufficient to satisfy this requirement.

## II. Application of This Standard to the Circumstances of this Case.

Applying this standard, the Court finds that the NLRB is entitled to injunctive relief in this case. However, the relief necessary is more narrow than that the NLRB seeks.

The NLRB easily satisfies the "reasonable cause" requirement. Without attempting to predict whether the NLRB will prevail before the ALJ, the Court finds that the NLRB has a strong claim that Miller actions "poisoned the well" sufficiently to call into question the lawfulness of its withdrawal of recognition from the Union. In the wake of the difficult and unsuccessful bargaining sessions in 1997, Miller's January 2 and January 16 letters to bargaining unit employees could be viewed as misleading and unfair. Causation could be inferred from the content of the letters and the temporal proximity between this correspondence and the ·anti-union petition. Moreover, Miller's waiver argument is unconvincing. The NLRB does not claim that Miller was unfair because it unilaterally raised wages or cut insurance costs; rather, its· complaint is based on Miller's conduct and representations in implementing these changes. Thus, the NLRB has demonstrated that there is reasonable cause to believe that a violation of the Act has occurred.[4]

Based on this conclusion, the Court rejects Miller's contention that the "status quo" must be viewed as the present circumstances—the relationship between Miller, the UAW, and the employees after Miller withdrew recognition. Yet the Court also does not believe that it must take affirmative steps to "recreate" the status quo existing at the time the NLRB initially ordered Miller to bargain in good faith. *Meter* makes clear that the a section 10(j) injunction must be narrowly tailored to ensure that the purposes of the Act will not be frustrated by actions that nullify or render meaningless a final order by the· NLRB in the pending proceeding. *See* 385 F.2d at 271. This may require preserving the current status quo in certain circumstances, and restoring a past status quo in other circumstances. The inquiry is simply whether existing circumstances or future actions will irreparably harm the union's ability to vindicate its alleged rights in the administrative proceedings.[5]

**3.** The NLRB relies on *Solien* and *Hendrix* for the proposition that the "reasonable cause" prong is satisfied unless there is no basis for the NLRB's allegations in the administrative proceedings. First, as set forth above, these cases discuss the standard for granting injunctions under section 10(*l*), not section 10(j). Again, their permissive language conflicts with the more rigorous tenure of *Meter*. Moreover, the "strong claim" standard set forth below is consistent with the *Solien* court's statement that reasonable cause is shown by a demonstration of a "substantial conflict in the evidence." *See* 593 F.2d at 87.

**4.** The Court also believes that the NLRB has satisfied the reasonable cause prong with regard to its surface bargaining claim. However, because the finding regarding unlawful withdrawal claim is sufficient to satisfy this prong, the Court believes an analysis of the surface bargaining issue is unnecessary.

**5.** The *Meter* court stated as follows:

The circumstances of the case must demonstrate that there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted. Administration of the Act is vested by Congress in the Board, and when the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless, temporary relief may be granted under section 10(j). Preservation and restoration of the status quo are· then appropriate considerations in granting temporary relief pending determination of the issues by the Board.

The Court finds that the NLRB has demonstrated that the Local Union's opportunity to vindicate its alleged rights in the administrative proceedings will be impaired permanently if, during the pendency of the proceedings, Miller is allowed to withhold recognition of the Local Union as the exclusive representative of the bargaining unit. At the conclusion of the proceedings before the NLRB, the Local Union (assuming it prevails) will not be able to alter the outcome of individual grievances, undo the effect of certain unilateral changes in the terms and conditions of employment, and effectively utilize relevant information previously withheld.

The Court therefore will enjoin Miller from taking action during the pendency of the administrative proceedings that are inconsistent with the recognition of the Local Union as the representative of the bargaining unit. First, Miller must provide the Local Union representatives requested, relevant information. Second, Miller must cease from directly dealing with unit employees in processing grievances. Third, Miller cannot make unilateral changes in the terms and conditions of employment of bargaining unit employees, except to the extent discussed below. Finally, Miller must be enjoined from denying unit workers the right to request and receive unpaid time off in order to conduct union business during scheduled work times. Miller must post appropriate notice regarding grievances and the right to request unpaid time off within ten (10) days of this Order.

■ The NLRB has not demonstrated, however, that other, more affirmative measures are necessary to prevent such irreparable harm. Specifically, the NLRB has failed to show how the efficacy of the administrative proceedings will be damaged if Miller refuses to bargain during the pendency of the proceedings. The Court cannot accept the NLRB's bald assertion that the mere absence of bargaining will cause further harm in the particular circumstances of this case. Although disaffection with the union among bargaining unit workers is a concern, the anti-union petition makes clear that much of the damage already may have been done. Moreover, given the history of dealings between Miller and the Local Union, there appears little chance that bargaining will lead to any positive outcome during the pendency of the administrative proceedings.[6] There has been no showing that continued, unsuccessful bargaining will either cure previous disaffection, prevent further disaffection, or protect the Local Union from some otherwise unavoidable harm. The NLRB has failed to demonstrate that requiring the parties to bargain would purge any existing taint or is necessary to preserve the Local Union's ability to enforce its rights before the Board.

■ The Court also finds that, in the absence of bargaining, unilateral, positive wage and benefit changes will not threaten the administrative process unless 1) Miller uses such changes to undermine the Local Union or the process or 2) the Local Union is not notified of such changes. The danger that there will be additional harm to the union or the process appears minimal unless one of these two circumstances are present. Moreover, preventing Miller from making bargaining unit employees' conditions better (provided such changes are not accompanied by anti-union representations) would not benefit the union or the employees it represents.

Thus, the Court will not order the parties to bargain and will not enjoin Miller from making unit-wide, positive wage and benefit changes during the pendency of the administrative proceedings. However, in light of Miller's past conduct, and to prevent it from undermining the Local Union and the proceedings in the absence of bargaining, the Court will enjoin Miller from making any representations regarding the Local Union or the NLRB proceedings when communicating with employees regarding these wage and benefit changes, and from directly or indirectly referencing these changes in other correspondence for the purpose of undermin-

---

*Id.* (quoting *Angle v. Sacks,* 382 F.2d 655, 660 (10th Cir.1967)).

**6.** Even if the parties bargain in good faith, the Court finds nothing in the record that indicates they are likely to avoid an impasse during the pendency of these proceedings.

ing the Local Union or the proceedings. Moreover, Miller must provide the Local Union with immediate notification of any such changes.

Finally, the Court notes that the issuance of this more narrow injunction satisfies the other two prongs of *Dataphase:* it serves the public interest and appropriately balances the harms between the parties. *See* 640 F.2d at 114. The public interest is served by protecting the integrity of the administrative process Congress provided for resolution of labor disputes. The Order also appropriately balances the harms by preventing irreparable harm to the Local Union, while imposing restrictions on Miller only to the extent necessary to preserve the viability of the administrative proceedings. Moreover, contrary to Miller's suggestion, an injunction of this type does not harm the employees. As an initial matter, the employee's stated desires in the anti-union petition may have been influenced by unlawful labor practices and therefore may not have legal significance. In addition, nothing in the Order will adversely affect the terms and conditions of their employment during the pendency of the NLRB proceedings, or their ability to protect their interests in the future.

### ORDER

Based on the foregoing, and all of the records, files, and proceedings herein, **IT IS HEREBY ORDERED:**

1. Petitioner's motion for a temporary injunction [Docket Nos. 1 and 4] is **GRANTED IN PART** and **DENIED IN PART.**

2. Respondent, its officers, representatives, agents, servants, and employees are, pending a final disposition of the matters involved herein pending before the NLRB, **ENJOINED AND RESTRAINED** from:

 a. Refusing to provide the Local Union representatives requested, relevant information.

 b. Dealing directly with unit employees in processing grievances.

 c. Unilaterally changing, altering, or modifying in any way, the terms and conditions of employment of bargaining unit employees, except for undisputedly positive wage and benefit changes.

 d. Denying unit workers the right to request and receive unpaid time off in order to conduct union business during scheduled work times.

 e. Making any representations regarding the Local Union, the UAW, or the NLRB proceedings when communicating with employees regarding any positive wage and benefit changes, or directly or indirectly referencing these changes in other correspondence for the purpose of undermining the Local Union, the UAW, or the proceedings.

3. Respondent shall post appropriate notice regarding paragraph 2.b. (grievances) and paragraph 2.d. (the right to request unpaid time off) within ten (10) days of this Order.

4. Prior to final disposition of the matter involved herein pending before the NLRB, Respondent shall notify the Local Union immediately upon granting a unilateral wage or benefit change.

5. Respondent shall provide the NLRB with a standard affidavit of compliance with the terms of this Order within twenty (20) days of this Order.