**MISSISSIPPI TRANSPORT, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**MISSISSIPPI TRANSPORT, INC., Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Petitioner.**

**Nos. 93–2600, 93–2882.**

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1994.

Decided Aug. 29, 1994.

Daniel R. Wachtler, St. Paul, MN, argued (Daniel R. Wachtler and Eric L. Leonard, on the brief), for petitioner/cross-respondent.

Joseph J. Jablonski, Washington, DC, argued (Howard E. Perlstein, Joseph J. Jablonski, Jr., Jerry M. Hunter, Yvonne T. Dixon, Nicholas E. Karatinos and Aileen A. Armstrong, on the brief), for respondent/cross-petitioner NLRB.

Before MAGILL, Circuit Judge, FLOYD R. GIBSON, and JOHN R. GIBSON, Senior Circuit Judges.

MAGILL, Circuit Judge.

Mississippi Transport, Inc. (MTI) petitions for review of a decision of the National Labor Relations Board (Board) finding that MTI violated §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (3) (1988). The Board cross-appeals for enforcement of its order. MTI argues that the Board's conclusions that MTI illegally asked its employees to report protected union activities, created the impression that it was conducting surveillance of employees' union activities, and discharged an employee for engaging in protected union activities were not supported by substantial evidence on the record as a whole. We reverse in part, but otherwise grant enforcement of the Board's order.

## I. BACKGROUND

MTI is a Minnesota corporation engaged in the business of transporting petroleum products by truck from area refineries to retail outlets in the Twin Cities area. The company headquarters in Stillwater, Minnesota, contains the administration, sales, and dispatch departments, a maintenance shop, and a parking facility for tractors and trailers. Duane Ahles, vice president of operations, oversees the headquarters' day-to-day operations. John Shaleen, the safety director and driver supervisor, oversees the drivers and is responsible for company compliance with state and federal safety rules.

Drivers report to the Stillwater terminal at the start of their shift and are dispatched with a list of loads for transport. MTI's drivers were frequently dispatched to the Ashland Refinery Terminal. Loading petroleum product at the Ashland terminal involves obtaining a loading card, moving the truck to the loading rack, pumping the proper amount and type of product into the various truck compartments, and receiving a bill of lading. There are frequently drivers from competing trucking companies, such as Indianhead Trucklines, at the loading rack at the same time as MTI drivers.

### A. March 26, 1991 Memorandum

In the fall of 1990, Teamsters Local 120 (Union) attempted to organize MTI's mechanics and truck washers. An NLRB election was held in October 1990, which ended in a tie vote. In December 1990, the Union began a new campaign to organize MTI's drivers. Two Indianhead drivers, Jeff Johnson and James Kroschel, were ardent union

supporters who began approaching MTI drivers to sign union cards while they were at the loading rack. MTI drivers reported Johnson and Kroschel's solicitation activities to company officials.

In December 1990, Shaleen called driver Gerald Leonard into his office and told him that another driver had reported that Leonard had been "talking union" at the Ashland terminal. The conversation ended when Leonard pointed out that the incident occurred when he was not on duty. Later, in the spring of 1991, Shaleen asked driver Michael Tietz whether anyone had approached him about joining the Union. Tietz stated that "some people were trying to pass out some cards at Ashland." When Shaleen asked if he was being bothered, Tietz replied that he could take care of it himself.

Johnson and Kroschel became increasingly more persistent. Very few of MTI's drivers, however, expressed interest in the Union. Indeed, some of the drivers were openly hostile to the Union; they viewed Johnson's and Kroschel's solicitation activities as harassment and complained about them to MTI officials. MTI driver Gregory Schiltz, for instance, complained bitterly about the union solicitors. Schiltz told Ahles that Johnson and Kroschel were constantly harassing him, sometimes remaining on the running board of his truck when he was trying to leave the Ashland terminal. Ahles testified that Schiltz told him that it had reached the point that he "would rather not even go [to the Ashland terminal] anymore; it would give him a knot in his stomach to have to go down there and it just made him very nervous."

In addition, Ahles testified that driver John Thompson complained about harassment by the Indianhead drivers. Thompson told Ahles that, when he was attempting to feed information into the computer at the loading rack, union solicitors punched him in the chest with their fingers and told him that "you will join the [U]nion." Ahles stated that his drivers were concerned that the intense union solicitation efforts at the Ashland terminal would interfere with their loading duties and lead to job-threatening mistakes.

Drivers also complained to Shaleen regarding union solicitation by Indianhead drivers at the Ashland terminal. Shaleen testified that drivers told him that they were being bothered when they were loading product and that Indianhead drivers were "getting up on the trucks when [the MTI drivers] were ready to leave." He stated that several MTI drivers told him that they wanted to "put . . . Kroschel in a dumpster." Moreover, Kroschel and Johnson both acknowledged that heated exchanges occurred between themselves and MTI drivers regarding the Union. Johnson admitted that his repeated soliciting irritated MTI drivers.

Meanwhile, in December 1990, the retailer SuperAmerica, a customer of both Indianhead and MTI, transferred six major accounts from Indianhead to MTI. Soon after this transfer, MTI officials began receiving reports from drivers which suggested that a concerted effort to discredit the company was underway. For instance, one MTI driver received a bogus phone call at the Ashland terminal loading rack directing him to deliver his load to the wrong SuperAmerica station. On another occasion, an assistant manager at a SuperAmerica station received a call advising him that an MTI driver had been verbally abusive to a SuperAmerica customer's girlfriend while making a delivery. Ahles testified that MTI investigated and concluded that the allegation was unfounded.

In addition, an Indianhead driver crossed a lane dividing line and splashed slush onto an MTI truck's windshield, temporarily blinding the driver. MTI officials attributed the incident to Kroschel. On another occasion, someone switched "customer cards" at the Ashland terminal, resulting in an incorrect bill of lading for a petroleum load. Finally, MTI received a call from Ashland's Kentucky offices informing MTI that someone had anonymously sent photos to Ashland depicting an MTI driver violating Ashland's loading policies.

In response to Johnson and Kroschel's solicitations and the incidents following SuperAmerica's transfer of the six accounts, Ahles posted a memorandum to MTI drivers. The memorandum stated:

YOU MUST BE GETTING TO THE COMPETITION......

IN THE PAST FEW WEEKS WE HAVE HAD EVERY NATURE OF SLANDER AND LIES SPREAD ABOUT BY OUR COMPETITORS OR THEIR DRIVERS. ON THE ONE HAND THEY ARE PUSHING YOU AND HARASSING YOU ABOUT JOINING THE UNION AND ON THE OTHER THEY ARE TRYING TO TAKE YOUR JOBS[.]

....

[after recounting the attempts to discredit MTI] THESE TYPES OF RUMORS AND LIES HAVE BECOME AN EVERY DAY OCCUR[RE]NCE.

*I AM ASKING YOU TO BE SURE THAT YOU DO EVERYTHING RIGHT.* YOU ARE BEING WATCHED.

IF YOU ARE HARASSED AT THE RACK OR WHILE YOU ARE WORKING ABOUT UNION ACTIVITIES I WANT TO KNOW IMMEDIATELY. WHEN, WHERE AND WHO.

YOU DO NOT HAVE TO PUT UP WITH THIS FROM PEOPLE WHO ARE MORE INTERESTED IN CAUSING YOU TROUBLE THAN IN DOING THE JOB THEY ARE GETTING PAID FOR (EVEN IF THEIR PAY IS LESS THAN YOURS).

DO YOUR JOB RIGHT—WE WILL CONTINUE TO GROW AND WE WILL CONTINUE TO HAVE A JOB....

Petitioner's App. at 135 (emphasis in original). Even after posting this notice, however, Ahles received additional complaints. Thus, a few weeks after posting the notice, Ahles wrote a letter to Indianhead's president, requesting that the harassment cease.

### B. Berger's Discharge/Shaleen–Leonard Meeting

On June 6, Ahles posted a memorandum notifying drivers of a change in driver scheduling procedures. The new policy required drivers who had worked at least 48 hours in a week but less than 56 hours to telephone the terminal on their days off and accept any available assignments. Until MTI instituted this new policy, driver Steve Berger opposed unionization. He felt, however, that the new policy precluded drivers from making plans on their days off. As a result, he began "pitching [the Union] pretty hard" to his fellow drivers.

Meanwhile, on June 8, Shaleen filled in for an injured driver. Shaleen drove to the Ashland terminal and loaded petroleum next to Kroschel. Kroschel did not recognize Shaleen and Shaleen said that he was a senior driver who normally hauled from another refinery. Kroschel then offered a union card to Shaleen, who took it and agreed to "think about it." Shaleen asked Kroschel if there were any MTI drivers who he could "talk to about it." Kroschel testified that he told Shaleen to talk to Berger.

Around this time, Berger obtained a union authorization card from a driver from another company. He mailed the card, signed and dated, to the Union on June 12. Berger was not scheduled to work from June 13 through June 15. He failed to telephone the MTI terminal on those days, however, in violation of the new call-in policy. When Berger arrived at work on June 17, Shaleen confronted him about failing to comply with the policy. They engaged in a heated argument, with Berger asserting that "we [MTI drivers] don't think it's ... fair." The argument ended slightly after four p.m., the time drivers were supposed to be on the road. Noticing that he was late, Berger boarded his truck and left without performing a pre-trip inspection of his vehicle. However, he signed an inspection form representing that he had completed an inspection.

On July 18, Shaleen prepared a warning notice for Berger's failure to conduct a pre-trip inspection. He testified that he had decided to suspend Berger for one day with pay for the incident. Shaleen consulted Ahles, who approved the suspension. Later that morning, Shaleen received a call from George Titus, a former MTI driver, who complained about an MTI driver. Titus said that he had been driving with his family a few days earlier when MTI truck number 202 passed him too closely at an excessive speed. Shaleen determined that Berger had been driving number 202 on the date in

question and that he could have been in the vicinity of the incident.

Believing that Titus was a reliable source, Shaleen decided to discharge Berger "for ... speeding once again." Berger had committed other infractions before: in April 1991, Berger was ticketed for speeding in an MTI vehicle; in July 1990, Shaleen observed Berger speeding in an MTI vehicle; in August 1989, Berger was ticketed for going through a red light; and in July 1989, he received a speeding ticket in his private vehicle. After learning of Titus's call, Ahles agreed with Shaleen that Berger should be discharged. Shaleen handed Berger a termination notice, who read it and asserted that the incident Titus had reported "didn't happen." Berger then left in an agitated state to speak to other drivers in the drivers' room. Leonard observed Berger and Shaleen coming down the hallway and heard Berger say that he had been terminated.

Soon after Berger left, Shaleen called Leonard into his office. Leonard testified that they had a short meeting and

> [Shaleen] told me that there was word going around that I had sent in a union card and he said, "I'm not going to ask you whether you did or didn't[,"] but he said, "there's word going around that you did" and he said, "maybe you would like to talk it over with some of your friends how this got around[."]

Tr. at 21.

After Leonard left Shaleen's office, Berger returned and asked for the name of the person who had reported the latest incident. Shaleen refused to disclose the complainant's name because of an incident in February in which an MTI driver had harassed a woman who had reported his unsafe driving. Neither Berger nor Shaleen mentioned the Union on June 18.

In August 1991, the Board issued a complaint and notice of hearing. The complaint alleged that MTI violated § 8(a)(1) of the Act by directing its employees to report union activities of other employees in the March 26 memorandum and by creating the impression, through Shaleen's June 18 conversation with Leonard, that it was conducting surveillance of employees' union activities. It also alleged that MTI violated § 8(a)(1), (3) of the Act by discharging Berger because he engaged in union activities.

An administrative law judge (ALJ) held a hearing on the matter in December 1991. In September 1992, the ALJ found that MTI had violated § 8(a)(1) and § 8(a)(3). In May 1993, the Board summarily affirmed the ALJ's findings of fact and conclusions of law. MTI now petitions for review of the Board's order. The Board cross-appeals for enforcement of its order.

## II. DISCUSSION

We are bound by the Board's findings of fact if they are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *GSX Corp. of Mo. v. NLRB*, 918 F.2d 1351, 1356 (8th Cir.1990) (citations omitted). MTI argues that the following findings of the Board are not supported by substantial evidence: (1) that MTI engaged in an unfair labor practice by issuing the March 26 memorandum; (2) that MTI engaged in an unfair labor practice by creating the impression, through Shaleen's June 18 comments to him, that Leonard's union activities were under surveillance; and (3) that MTI unlawfully discharged Berger because of his union activities. We address these arguments in turn.

### A. Unfair Labor Practices: § 8(a)(1)

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations" and "to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of these rights. *See id.* § 158(a)(1). The inquiry under § 8(a)(1) is an objective one which asks whether, considering "'the entire factual context,'" *Wyman–Gordon Co. v. NLRB*, 654 F.2d 134, 145 (1st Cir.1981) (citation omitted), the employer's conduct "'reason-

ably tends to interfere' with the employees' exercise of their [s]ection 7 rights." *NLRB v. Hitchiner Mfg. Co.*, 634 F.2d 1110, 1113 (8th Cir.1980) (quoting *NLRB v. Intertherm, Inc.*, 596 F.2d 267, 271 (8th Cir.1979)).

### 1. March 26 Memorandum

MTI first argues that there is not substantial evidence on the record to support the Board's conclusion that Ahles's March 26 memorandum violated § 8(a)(1). It is well established that "employer requests that employees inform as to other employees' union activities exert a coercive influence on employees' organizational rights." *Bank of St. Louis v. NLRB*, 456 F.2d 1234, 1235 (8th Cir.1972). There is not substantial evidence on the record as a whole that Ahles's March 26 memo was such a request. The memo must be read "in the context of conduct which had actually occurred." *Id.* In context, the memo could not reasonably have been interpreted to direct MTI drivers to report to management other MTI drivers who were involved in union solicitation.

First, what had occurred in the period leading up to the issuance of the memo were (1) constant complaints by MTI drivers to company officials that Indianhead drivers were harassing them at the Ashland loading rack and sometimes interfering with their ability to perform their jobs and (2) incidents that MTI officials perceived as retaliation against MTI for SuperAmerica's decision to transfer six major accounts from Indianhead to MTI. The only evidence on the record that MTI drivers were involved in soliciting other MTI drivers to join the Union during the period leading up to the issuance of the memo was the isolated comment by Shaleen in December that he had heard that Leonard was "talking union" at the Ashland terminal.

Moreover, immediately after the paragraph relating to reporting harassment to Ahles, the memo stated, "YOU DO NOT HAVE TO PUT UP WITH THIS FROM PEOPLE WHO ARE MORE INTERESTED IN CAUSING YOU TROUBLE THAN IN DOING THE JOB THEY ARE GETTING PAID FOR (*EVEN IF THEIR PAY IS LESS THAN YOURS* )." Petitioner's App. at 135 (emphasis added). The empha-

sized language makes clear that the memo was referring to union solicitation by *non-MTI personnel* during working hours. Similarly, in light of the numerous attempts to discredit MTI's reputation and the structure of the memo, *see supra* at 975–76, the admonition to "*BE SURE THAT YOU DO EVERYTHING RIGHT* [because] YOU ARE BEING WATCHED" cannot reasonably be read as a warning not to engage in union activities. *Id.* Thus, "in the context of conduct which had actually occurred," *Bank of St. Louis*, 456 F.2d at 1235, there is not substantial evidence on the record as a whole to support the conclusion that MTI drivers would have read the memo as a request to inform management of other employees' union activities.

### 2. Shaleen–Leonard Meeting

Next, MTI argues that there is not substantial evidence on the record to support the Board's finding that Shaleen's conversation with Leonard on June 18 illegally created the impression that employees' union activities were under surveillance. Under § 8(a)(1), it is an unfair labor practice for an employer to create the impression that it is subjecting employees' lawful union activities to surveillance "because it could inhibit the employees' right to pursue union activities untrammeled by fear of possible employer retaliation." *NLRB v. Chem Fab Corp.*, 691 F.2d 1252, 1258 (8th Cir.1982). According to Leonard, Shaleen called Leonard into his office fifteen minutes after Berger had been discharged. They had a brief conversation in which Shaleen said that there was word going around that Leonard had sent in a union card; and that "I'm not going to ask you whether you did or didn't" but "maybe you would like to talk it over with some of your friends how this got around." Tr. at 21.

We hold that substantial evidence on the record as a whole supports the Board's finding that Leonard could reasonably assume from Shaleen's comments that MTI had his union activities under surveillance: (1) the comments could reasonably create the impression that MTI was monitoring Leonard's union activities; (2) they did not occur in casual conversation, but rather in a formal

meeting in Shaleen's office; and (3) they occurred minutes after Berger had been discharged, suggesting that Shaleen was exploiting the timing to make a point to Leonard. Thus, we enforce the Board's order as to Shaleen's comments to Leonard on June 18.

## B. Berger's Discharge

 MTI next argues that there is not substantial evidence on the record as a whole to support the Board's finding that employee Berger was discharged because of his union activities in violation of § 8(a)(1), (3). In *Wright Line*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), the Board set forth the elements of an unlawful discharge claim under the Act. The General Counsel must first establish a prima facie case of unlawful discrimination by proving that the employee's protected conduct was a substantial or motivating factor in the employer's decision to discharge the employee. *See GSX Corp.*, 918 F.2d at 1357. If this element is satisfied, the burden then shifts to the employer to prove by a preponderance of the evidence that it would have taken the same action even in the absence of the employee's union activity. *See id.*

We hold that substantial evidence on the record as a whole supports the Board's finding that MTI discharged Berger in violation of § 8(a)(1), (3). First, there is substantial evidence on the record that the General Counsel established a prima facie case. Kroschel's statement to Shaleen that he could speak to Berger about the Union, which the Board credited, supports the reasonable inference that Shaleen was on notice that Berger supported the Union. MTI argues at length that the Board should have believed Shaleen, who testified that Kroschel did not mention Berger's name, instead of Kroschel. There are no extraordinary circumstances here, however, that would allow us to overturn such a credibility finding. *See Williams Enters. v. NLRB*, 956 F.2d 1226, 1232 (D.C.Cir.1992).

Moreover, there is circumstantial evidence on the record to support the inference that MTI had an unlawful motive in discharging Berger: Berger was discharged within two weeks of MTI learning of his union activities, *see Hall v. NLRB*, 941 F.2d 684, 688 (8th Cir.1991) (timing of adverse employment decision is given great weight as an indication of antiunion motive); MTI exhibited hostility to the Union, as suggested by the violation of § 8(a)(1) and other conduct, *see id.* (inference of an employer's unlawful motive may be drawn from the employer's hostility to the union); and MTI failed to investigate Titus's phone complaint regarding Berger or give Berger a chance to respond to the charges, *see NLRB v. Advance Transp. Co.*, 979 F.2d 569, 574 (7th Cir.1992), even though the company normally investigated public complaints. Thus, substantial evidence on the record supports the Board's findings that the General Counsel established a prima facie case of unlawful discharge.

The next issue is whether there is substantial evidence on the record to support the Board's conclusion that MTI failed to meet its burden of showing that it would have discharged Berger even in the absence of his union activities. *See GSX Corp.*, 918 F.2d at 1357. We believe that substantial evidence supports the Board's finding. MTI failed to satisfy its burden of proof. It does not argue on appeal that it fired other drivers with records similar to Berger's or that it retained union activists with records similar to Berger's. Rather, MTI's only argument on appeal is that Berger's personnel record was much worse than the records of four other drivers who were not discharged. Evidence that it did not fire four employees who had fewer infractions than Berger, however, does not satisfy MTI's burden of proving that it would have fired Berger even in the absence of his union activities.

 Indeed, MTI's argument seems to be that it satisfied its burden merely by showing that Berger committed numerous infractions. However, "[t]he company does not meet its burden merely by showing that a legitimate reason may also have existed for the termination; instead, it must show that its legitimate reason, standing alone, would have induced it to discharge [the employee]." *Advance Transp. Co.*, 979 F.2d at 574. Without

evidence that MTI discharged similarly situated drivers or at least evidence that Berger's conduct merited discharge under established company policy, the Board was entitled to find that MTI failed to prove that Berger would have been discharged anyway. Thus, we enforce the Board's order as to Berger's discharge.

## III. CONCLUSION

For the foregoing reasons, we refuse to enforce the Board's order as to the March 26 memorandum, but enforce the order as to Shaleen's June 18 meeting with Leonard and Berger's discharge.

FLOYD R. GIBSON, Senior Circuit Judge, concurring in part and dissenting in part.

I agree with the majority's decision to not enforce the Board's order as it relates to the company memorandum and to enforce the order as it relates to Shaleen's meeting with Leonard. However, because I believe that MTI has demonstrated by a preponderance of the evidence that it would have taken the same action even in the absence of Berger's union activity, I dissent from that portion of the majority's opinion.

MTI has shown that there were legitimate grounds for Berger's discharge and that these reasons, standing alone, would have caused it to terminate him. First, Berger refused to comply with the company's recent call-in policy. Second, Berger had a poor driving record, which culminated in MTI receiving a complaint from a member of the public about Berger's dangerous driving. His admitted insubordination, flaunting of company rules, and poor driving record, combined with the recent complaint about his dangerous driving, are a sufficient basis for Berger's discharge. I believe that MTI presented ample support that Berger would have been discharged despite his union activities. Therefore, I would affirm the Board's order as to the meeting with Leonard, but not for the other two reasons.