Ronald M. SHARP, Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

KORONIS PARTS, INC., Respondent.

Civil No. 6–96–111.

United States District Court,
D. Minnesota,
Sixth Division.

June 17, 1996.

National Labor Relations Board by Florence I. Brammer, Minneapolis, Minnesota, for Petitioner.

Law Offices of Martin L. Garden by Steven C. Miller, Minneapolis, Minnesota, for Respondent.

### *ORDER*

ALSOP, Senior District Judge.

The above-entitled matter comes before the Court upon Petitioner's motion for a temporary injunction under section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) ("section 10(j)") (docket no. 1). Petitioner ("NLRB") asks the Court to enjoin Respondent Koronis Parts, Inc. ("Koronis") from engaging in certain practices that the NLRB alleges to be in violation of employees' rights under the National Labor Relations Act, 29 U.S.C. §§ 157 and 158(a)(1) and (3) ("the NLRA"). The NLRB also asks the Court to order Koronis to take certain affirmative action with respect to employees allegedly disciplined and terminated in viola-

tion of the act. A hearing on the amended and consolidated Complaint was held before the Honorable William J. Pannier, III, Administrative Law Judge of the NLRB ("ALJ") on April 17, 1996 and consecutive days thereafter. The transcript from the hearing has been made a part of the record. A hearing before this Court was conducted prior to oral argument to hear testimony from Koronis' President Ed Webb ("Webb") about the hardship to Koronis if the Court granted the requested injunctive relief.

Koronis is a manufacturer of aftermarket replacement snowmobile parts and accessories with operations in Paynesville, Minnesota. The company is co-owned by Webb and his wife and in the fall of 1995 employed approximately 50 people in its Paynesville operations. The dispute arises out of an organizing campaign which Koronis employees began in September 1995. The NLRB alleges that after the campaign was underway Koronis took various actions to discourage employees from supporting the union in violation of the NLRA. In particular, the NLRB alleges that employees instrumental in the organizing campaign were terminated because of their union activities.

In a letter dated September 7, 1995 Teamsters Local 970 ("Teamsters") notified Webb that the Teamsters had begun an organizing campaign at Koronis. The letter identified Bill Bertram, a Koronis employee, as a member of the organizing committee. A second letter from the Teamsters dated September 15, 1995 named six additional employees on the organizing committee including Alan Remmel and Robert Kessler (a/k/a/ "Robert Kesoler"). Koronis terminated Remmel November 21, 1995 and Bill Bertram December 19, 1995. According to Koronis the terminations were based upon factors not related to Remmel and Bertram's union activities. Kessler left Koronis Nov. 27, 1995 purportedly to take up a new position. A fourth person, Tamara Sondrol, who was employed by a temporary agency and placed at Koronis in mid-September, allegedly could not continue her placement at Koronis and was not hired into a permanent position because she expressed support for the union.

The Teamsters filed charges with the NLRB on October 4, 1995 and on several occasions thereafter alleging that Koronis had engaged in unfair labor practices. After a field investigation in which both parties had an opportunity to submit evidence upon the charges, the NLRB issued a complaint and the matter was brought before the ALJ. Pending a decision of the ALJ, the NLRB asks this Court for an injunction reinstating Bertram, Remmel and Sondrol and expunging disciplinary warnings and other records from their personnel files and those of other employees. In addition it seeks an injunction prohibiting Koronis from further acts in violation of the NLRA.

## I. ISSUE

The NLRB argues that in considering this petition for injunctive relief under section 10(j) the Court should apply a two-step analysis and determine: (1) whether there is reasonable cause to believe that an unfair labor practice has occurred; and (2) whether equitable relief is "just and proper". Koronis disagrees that the two-step analysis is appropriate and argues that traditional equitable analysis should be employed. According to Koronis such analysis requires the Court to employ the four-step analysis laid down in *Dataphase Systems, Inc. v. CL Systems,* 640 F.2d 109, 113 (8th Cir.1981).

Both parties rely upon *Minnesota Mining and Manufacturing Company v. Meter,* 385 F.2d 265 (8th Cir.1967) to support their interpretation of what is the appropriate legal standard. In *Minnesota Mining* the Eighth Circuit held:

The district judge's discretion in granting temporary relief under Section 10(j) cannot be activated and motivated solely by a finding of 'reasonable cause' to believe that a violation of the Act has occurred. More is required to guide his permissive range of discretion. Section 10(j) is reserved for a more serious and extraordinary set of circumstances where the unfair labor practices, unless contained, would have an adverse and deleterious effect on the rights of the aggrieved party which could not be remedied through the normal Board channels.

385 F.2d at 272. The NLRB urges the Court to find that the language in *Meter* indicates that the traditional equitable crite-

ria are not to be considered when determining whether to grant temporary relief under 10(j). In support of its position the NLRB cites two Eighth Circuit cases, both involving an injunction brought under section 10(*l*) of the NLRA.[1] *Solien v. United Steelworkers of America*, 593 F.2d 82, 87 (8th Cir.1979) *cert. denied, United Steelworkers of America v. Solien*, 444 U.S. 828, 100 S.Ct. 54, 62 L.Ed.2d 36 (1979) and *Hendrix v. Operating Engineers, Local 571*, 592 F.2d 437, 441–43 (8th Cir.1979). Koronis urges the Court to recognize that a different standard applies in 10(j) cases than in 10(*l*) cases and to follow the approach of at least three other circuits and employ traditional equitable principles when determining whether to grant relief under 10(j).[2] *See Pye v. Sullivan Bros. Printers, Inc.*, 38 F.3d 58, 63 (1st Cir.1994); *Miller v. California Pacific Medical Center*, 19 F.3d 449, 451–52 (9th Cir.1994); *Kinney v. Pioneer Press*, 881 F.2d 485, 490 (7th Cir. 1989). Then if traditional equitable principles are to be used, Koronis argues that *Dataphase* provides the test applied in the Eighth Circuit for determining whether an injunction should issue. Under *Dataphase* the Court considers: (1) the threat of irreparable harm; (2) the balance between the harm to the movant and the injury to the other party if the injunction issues; (3) the probability that petitioner will succeed on the merits; and (4) the public interest. *Id.* at 114.

■ Examining the requirements for issuing an injunction under *Minnesota Mining*, the Court finds a close similarity with traditional equitable principles and the four factors described in *Dataphase*. *See Burlington Northern R. Co. v. Bair*, 957 F.2d 599, 603 n. 4 (8th Cir.1992). The Court acknowledges that the Eighth Circuit has never explicitly employed traditional equitable analysis in a section 10(j) case, however as the Court noted in *Burlington, Minnesota Mining* did consider traditional equitable principles such as irreparable harm in determining

whether injunctive relief was "just and proper". Since *Minnesota Mining* at least three other Circuits have interpreted "just and proper" to mean a consideration of traditional equitable principles. *Sullivan Bros.*, 38 F.3d at 63; *Miller*, 19 F.3d at 451–52; *Kinney*, 881 F.2d at 490. For these reasons the Court will employ the traditional equitable analysis in reviewing this petition for an injunction and determine whether petitioner satisfies the four-part test in *Dataphase*.

## II. *Dataphase Analysis*

■ The first issue is whether the NLRB has shown a probability of success on the merits. The NLRB alleges that Koronis has acted through interrogations coercion, threats, interference, surveillance, discriminatory discipline and retaliatory termination in violation of 29 U.S.C. §§ 157 and 158. 29 U.S.C. § 157 guarantees employees the right to self-organization. 29 U.S.C. § 158 provides that it is an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of employees' rights to self-organize. To establish that Koronis has interfered with employees' exercise of their rights, its must be shown that its conduct "reasonably tends to interfere" with the employees' exercise of their section 7 rights. *See Mississippi Transport, Inc. v. NLRB*, 33 F.3d 972 (8th Cir.1994) (citations omitted). The NLRB points to Koronis' conduct towards several employees who were active in the organizing campaign as evidence that Koronis violated the NLRA. In its defense Koronis explains that in each case its actions were legitimate business decisions not related to any protected activity and not in violation of the NLRA.

Remmel is one of the employees on the organizing committee who the NLRB claims was disciplined and ultimately terminated in violation of the NLRA. As evidence that Remmel was disciplined for engaging in a

---

1. Section 10(*l*), found at 29 U.S.C. § 160(*l*) sets out the standard for requesting and granting injunctive relief when it has been charged that a violation of certain provisions of 29 U.S.C. § 158 has occurred. The provisions refer to strikes and boycotts to force recognition of uncertified labor activity, none of which have been alleged in the present case.

2. It also cites cases from two other circuits acknowledging that equitable considerations should be factored into the court's review of a 10(j) petition. *Kaynard v. Mego Corp.*, 633 F.2d 1026 (2nd Cir.1980); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185 (5th Cir.1975) *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976).

protected activity the NLRB cites a letter to Remmel from Bruce Vanderpool, Koronis' Operation and Sales Manager, dated October 16, 1995 which expressed Vanderpool's concern for discussions he heard Remmel had had with other Koronis employees about wages. (General Council Exhibits ("GC Ex.") 27). The letter admonished Remmel that wages was not a subject for discussion between employees. It related an offer to Remmel from Webb to take "a day off with pay to look for another job that meets your goals." *Id.* On November 27, 1995 Remmel was terminated. According to Koronis he was terminated pursuant to an agreement made a year earlier which provided that his position would be eliminated if clutch sales were inadequate. Even if the Court accepts Koronis's explanation for Remmel's termination as true, Koronis cannot explain away the letter to Remmel admonishing him about wage discussions and finding a new job. As the NLRB shows, such a warning has been found to be a violation of protected activity. *See NLRB v. Intertherm, Inc.,* 596 F.2d 267, 276 (8th Cir.1979).

Bertram is a second employee on the organizing committee who the NLRB claims was disciplined and later terminated in violation of the NLRA. The record shows that Bertram received several warnings between mid-September 1995 and the time he was terminated. Koronis strongly disputes the NLRB's claim that the warnings were issued because of Bertram's involvement with the union. In addition it maintains that Bertram was terminated because he attempted to sabotage an Occupational Safety and Health Administration test. Even if the Court accepts as true Koronis' explanation for Bertram's termination and some of the warnings, there is sufficient evidence to show a probability of success on the merits on the NLRB's claim that Koronis violated Bertram's rights when it issued a warning for improper telephone use. On November 7, 1995 Bertram received a written warning for making a long distance call to a union representative on break time. While it is undisputed that Koronis had a

policy prohibiting employees from using the telephone without authorization, the evidence shows that Koronis did not issue Bertram the warning until after it had traced the call and discovered it had been made to a union representative. Koronis does not deny that it traced the call or that it normally did not trace employee's unauthorized calls but insists that it had to trace the call to determine whether the call was personal or business. At the ALJ hearing Koronis conceded, however, that Bertram had no duties that would require him to make a business call and thus company officials could have concluded when they saw him on the phone that it was a personal call. (ALJ Transcript at 656).

Kessler is a third employee on the organizing committee who was allegedly disciplined and intimidated because of his union activities.[3] At the ALJ hearing Kessler testified that after he had been handing out union literature during break time, Bob Cloakey, Plant Manager, approached him and asked him to come to his office. There Cloakey told Kessler that although he could not force Kessler to do anything Cloakey wanted Kessler to pass out the literature after work rather than during break. Eventually Kessler agreed. The NLRB maintains that Cloakey's request was an interference with the right to distribute literature. *See, e.g., Ichikoh Mfg.,* 312 NLRB 1022 (1993), enfd. 41 F.3d 1507 (6th Cir.1994). While Koronis claims its request was prompted by a legitimate concern that employees were not returning to work promptly after break, it offers no legal authority to justify such a restriction. In another incident, Kessler was meeting with Webb when Webb allegedly stated that if the union got in he would close the plant. A threat to close a plant has been found to be in violation of protected activities. *See e.g., Woodline Motor Freight, Inc. v. NLRB,* 843 F.2d 285 (8th Cir.1988), enforcing 278 NLRB 1141, 1986 WL 54210 (1986); *NLRB v. Hitchiner Mfg. Co.,* 634 F.2d 1110, 1114 (8th Cir.1980). Webb does not deny making the

---

**3.** On November 27, 1995 Kessler was terminated. While his termination was not made a subject of the NLRB's complaint, the NLRB argues that it may be considered evidence of Koronis' anti-union stance. The paper terminating Kes-

sler state that he went to work for a company in Albany, however the nature of the departure is marked both "voluntary" and "involuntary". (Respondents Ex. 39.)

statement but claims that it was followed immediately by a disavowal of that intent.

Tamara Sondrol was placed by a temporary placement agency, Work Connection, as a welder at Koronis on September 18, 1995 and her services were allegedly terminated three weeks later and she was not hired into a permanent position in violation of the NLRA. On the day Koronis informed Sondrol's employer that her services were no longer needed, she had attended a meeting with other employees to discuss working conditions with Koronis' President, Ed Webb. During the meeting she allegedly voiced her concern about one employee's wages and about the condition of a piece of equipment. Koronis contends that it ended its relation with Sondrol because it was looking for someone who would make a long-term commitment to the company and she had failed to make a commitment. The NLRB maintains that Koronis did not like Sondrol's sympathy for the union. As further evidence of its claim the NLRB offers a copy of her resume from Koronis with the hand-written word "union" crossed out, allegedly in Vanderpool's handwriting. Koronis admits that Vanderpool made the decision not to hire Sondrol, but contends that the writing was a doodle that does not reflect union animus.

Further, the NLRB claims that Koronis' handbook contains a provision on the discussion of wages among employees that violates protected rights. In a section entitled "Wages" a paragraph set off in a box reads:

> Wages paid to employees by the Company are personal and confidential. The Company asks that wage discussions be limited between the employee and their supervisor, plant manager or Company owners only.

Koronis maintains that its policy was intended to encourage employees to take matters up with the company officials who could implement changes. The NLRB argues that the prohibition of wage discussions among employees constitutes unlawful interference with employees' rights under 29 U.S.C. § 157, citing *Radisson Plaza Minneapolis v. N.L.R.B.,* 987 F.2d 1376, 1381–82 (8th Cir. 1993), enforcing 307 NLRB 94 (1992); *Waco, Inc. v. United Steelworkers of America,* 273 NLRB 746, 1984 WL 37122 (1984). Koronis

provides no legal authority to show its policy is permissible.

The NLRB also argues that Koronis distributed bonuses to certain employees and cash prizes during the organizing campaign in violation of the NLRA. *See, e.g., Dlubak Corp.,* 307 NLRB 1138 (1992), enfd. without opinion 5 F.3d 1488 (3rd Cir.1993); *Angelica Corp.,* 276 NLRB 617 (1985); *The Gerkin Co.,* 279 NLRB 1012 (1986). Koronis maintains that the distribution of prizes was planned before the organizing campaign began and was not done to interfere with employee's rights. It admits the presentation of awards took place September 27, 1995 but contends that this date was based upon the availability of the plaques and cooks for the food.

■ Considering the evidence discussed above, and given the circumstances surrounding the disciplinary action against Remmel, Bertram and Kessler, the threat to close the plant, the prohibition of wage-related discussion among employees, and the distribution of prizes and cash shortly after the organizing campaign began, the Court finds that the NLRB has shown the probability of success on the merits.

Koronis argues that even if the NLRB shows the probability of success, it cannot show that there is no adequate remedy because the claims have come before an ALJ and he can provide any appropriate relief. The Court does not find Koronis' argument persuasive. It may be several months before an ALJ decision and any appeal are completed. While the decision may ultimately provide relief for the actions complained of, in the meantime organizing efforts may continue to be stymied by improper conduct on the part of Koronis. In a recent Seventh Circuit case on a section 10(j) injunction, the Court considered a similar argument and observed, that in such a case "the court's mission is to determine whether the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual." *NLRB v. Electro–Voice, Inc.,* 83 F.3d 1559, 1566 (7th Cir.1996) (citing *Kinney v. Pioneer Press,*

881 F.2d at 487). In *Electro–Voice* the Court found that the dismissal of union organizers, threats of plant closure, and the other evidence of unfair labor practices indicated that as time passed pending a decision of the board, the likelihood of union formation diminished and the possibility that employees would be irreparably deprived of union representation increased. *Id.*, 83 F.3d at 1572. The Court held that an injunction was appropriate. Considering the evidence in the instant case, the Court finds that the passage of time pending a decision of the ALJ in this case will so adversely effect employees' rights that the organizing effort will become meaningless. Thus the Court concludes that petitioner has shown it has no adequate remedy at law. Following from this, the Court finds that because Koronis' actions threaten to nullify organizing efforts and render the Board's remedial action ineffectual, issuance of an injunction is in the public interest.

The remaining element requires the Court to balance the harm to Koronis if the injunction issues, with the harm to the employees if it does not issue. The Court notes that Koronis agreed to several aspects of the requested relief, and therefore the Court will consider the balance of harms only with respect to the disputed relief. The harm that would come to employees and their organizing efforts if the injunction does not issue is discussed above. With respect to the harm to the employer if the injunction issues, the Court acknowledges the testimony of Webb that the reinstatement of terminated employees would not be possible unless he were to terminate other employees. Given the burden reinstatement would force upon Koronis and the availability of complete relief for the discharged employees should the ALJ rule in their favor, the Court agrees with Koronis that the harm to Koronis with respect to the requested reinstatement and expungement exceeds the threat of injury to the employees. The Court does not agree with Koronis' argument that ordering the company not to make disciplinary action or dismissals based upon employee's union activities, or not to give cash prizes or bonuses to employees in order to discourage employee support for the union, would unduly burden company decision-making. *See Electro–Voice*, 83 F.3d at 1573. Accordingly, the Court finds the injury to the petitioners if such conduct is not enjoined outweighs any harm to Koronis.

Accordingly, upon review of all the files, records and proceedings herein,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that, pending the final disposition of the matters involved before the NLRB, that an injunction in the form attached be and hereby is issued.

**IT IS FURTHER ORDERED THAT:**

Koronis Parts, Inc. post copies of the District Court's order at Respondent's Paynesville Minnesota facilities, where notices to employees are customarily posted. Said postings shall be maintained during the Board's administrative proceedings free from all obstructions and defacements, and permit agents of the Board reasonable access to Respondent's Paynesville, Minnesota facilities to monitor compliance with this posting requirement.

### *TEMPORARY INJUNCTION*

Koronis Parts, Inc., its officers, representatives, agents, servants, employees, members and all persons acting in concert or participation with it, be, and they hereby are, pending the final disposition of the matters involved herein pending before the Board,

**ENJOINED AND RESTRAINED FROM:**

1. Maintaining any policy prohibiting employees from discussing their wages with one another.

2. Instructing employees to not discuss wages with other employees.

3. Threatening employees that if they will not wear "VOTE NO" T-shirts at Respondent's Paynesville, Minnesota facility, the T-shirts have to be returned.

4. Instructing employees to not hand out union literature during breaks.

5. Awarding bonuses and gifts to employees in order to discourage employee support for the union.

6. Instructing employees to find different jobs.

7. Threatening employees that they would have received better bonuses if their attitudes had been better.

8. Threatening to close Respondent's facility if a union got in.

9. Creating the impression that employees' union activities are under surveillance.

10. Interrogating employees regarding the employees' support for a union.

11. Threatening employees that they cannot pass out union literature on break times.

12. Interrogating employees regarding the employees' union activities and sympathies.

13. Issuing written warnings to employees in retaliation against their union activities and sympathies.

14. Transferring employees in retaliation against their union activities and sympathies.

15. Refusing to hire individuals in retaliation against their union activities and sympathies.

16. Suspending or sending employees home in retaliation against their union activities and sympathies.

17. Discharging employees in retaliation against their union activities and sympathies.

18. Revoke the employee handbook policy prohibiting employees from discussing their wages with one another, and notify employees in writing that this has been done.